[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
September 14, 2005
THOMAS  K. KAHN
CLERK

No. 03-14278

D. C. Docket No. 01-00841-CR-1-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CHARLES LVONNE SMITH, JR.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(September 14, 2005)**

Before EDMONDSON, Chief Judge, FAY, Circuit Judge, and CORRIGAN[*],
District Judge.

---

[*]Honorable Timothy J. Corrigan, United States District Judge for the Middle District of Florida,
sitting by designation.

PER CURIAM:

After three trials, Charles Smith, Jr. was convicted of armed bank robbery and the use of a firearm in that robbery. He now appeals. We affirm.

Background

A. The Robberies

According to the Government, on the evening of 6 November 2001, Defendant Charles Smith, Jr. and Todd Griffin drove from Dalton, Georgia, to Atlanta, Georgia. In route, while Griffin waited in the car, Smith robbed a Country Cupboard convenience store. The two proceeded to a BP convenience store, which Smith also robbed while Griffin waited in the car.

Following the convenience store robberies, Smith and Griffin drove to a motel, where Smith checked into a room. Griffin testified that later that morning -- after sunrise -- Smith proposed that they rob a bank. After Griffin refused, Smith left. Smith returned approximately 45 minutes later and threw several rolls of bills on the bed, telling Griffin that he would not get any of the money because of his refusal to participate.

2

Rosalyn Davis, a teller at the Peachtree National Bank, testified that shortly after 11 a.m., Smith approached her, pointed a silver semiautomatic pistol, and asked her for money. After she handed him $5,000.00, Smith ran out of the bank.[1]

Between nine and twelve days after the robberies, three witnesses identified Smith in photographic lineups. Rosalyn Davis, the bank teller, was asked to view six photos. Of all six persons photographed, only Smith was shown in front of a cinder block wall. Davis identified Smith in the lineup and again at trial.

B.    The Trials

Smith was indicted on two counts of armed robbery, one count of bank robbery, and three counts of using a firearm during a violent crime. The jury acquitted Smith of the convenience store robberies and of the two related firearms counts in 2002, but the jury was unable to reach a verdict on the bank robbery and associated gun count. In January 2003, Smith was retried on those counts. The jury was again unable to reach a verdict. In May 2003, Smith was tried for a third time.

---

[1] In contrast, the defense alleges that Smith was driven to Atlanta by his ex-wife and met Griffin at the motel. The defense contests Smith's participation in the bank robbery.

At trial, the district court permitted testimony about the convenience store robberies.  In addition, the district court permitted several of the eyewitnesses to discuss their level of certainty about their identification of Smith as the robber. The district court prohibited Smith from presenting the testimony of an expert in the field of eyewitness identification.  The court also refused to provide an instruction regarding certain issues of eyewitness identification.

The jury found Smith guilty on both counts.

Discussion

A.    Collateral Estoppel

Smith contends that the Government's presentation of testimony and evidence about the convenience store robberies -- despite his earlier acquittal -- was barred by the collateral estoppel rule of the Double Jeopardy Clause.  We review de novo Smith's collateral estoppel claim.  United States v. Gil, 142 F.3d 1398, 1401 (11th Cir. 1998).

The doctrine of collateral estoppel provides that "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot

again be litigated between the same parties in any future lawsuit." Ashe v. Swenson, 90 S.Ct. 1189, 1194 (1970). But, collateral estoppel does not operate as a per se bar against the admission -- in a later trial -- of evidence used in an earlier trial that resulted in an acquittal. Dowling v. United States, 110 S.Ct. 668, 672 (1990). Evidence from an earlier trial is only prohibited if it relates to facts that were "necessarily established" by the earlier judgment. United States v. Rivera, 77 F.3d 1348, 1352 (11th Cir. 1996).

To ascertain whether an issue was actually determined when the jury entered a general verdict, "a court [must] examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." Ashe, 90 S.Ct. at 1195 (internal quotation marks and citations omitted). The "burden [is] on the defendant to demonstrate that the issue whose relitigation he seeks to foreclose was actually decided." Dowling, 110 S.Ct. at 673.

Because an acquittal of a criminal charge does not "prove that the defendant is innocent [but] merely proves the existence of a reasonable doubt as to his guilt," we will later allow evidence of the pertinent prior conduct where we require a

lower standard of proof. Dowling, 110 S.Ct. at 672 (quoting United States v. One Assortment of 89 Firearms, 104 S.Ct. 1099, 1104 (1984)).[2]

Here, the earlier jury rendered a general verdict on both charges on the convenience store robberies. Upon examining the record, we conclude that these general verdicts do not represent findings of true innocence that preclude the admission of evidence.

Smith presented two different defenses to the robbery charges: an alibi and a lack of nexus to interstate commerce. Because the jury rationally could have based its acquittal on the Government's failure to demonstrate a nexus to interstate commerce, Smith's factual innocence of the robberies was not "necessarily established."

Smith alternatively argues that his acquittal on the gun counts represents a determination of his factual innocence. He contends that, because it was clear that the robber used and carried a gun, the only question left for the jury to determine was whether he committed the robbery and that his acquittal indicates that the jury concluded that he did not. Smith's contention at the earlier trial did focus on

---

[2]In Dowling, the Supreme Court concluded that the earlier acquittal of a robbery charge did not preclude the introduction of testimony under Rule 404(b) of the Federal Rules of Evidence in a later trial for bank robbery. The Court explained that -- in contrast to the reasonable doubt standard required for a conviction -- the Rule 404(b) standard only required for admissibility that a jury be able to "'reasonably conclude that the act occurred and that the defendant was the actor.'" Dowling, 110 S.Ct. at 672 (quoting Huddleston v. United States, 108 S.Ct. 1496, 1501 (1988)).

questioning his participation at all in the robberies, without much (if any) effort

spent on contesting the use of a firearm during their commission. But the earlier

court's instruction on the firearms counts required the jury to determine that the

following three acts were proved beyond a reasonable doubt: 1) Smith committed

the robberies, 2) during and in relation to their commission, Smith used or carried

a firearm, and 3) Smith used or carried the firearm knowingly. Without further

evidence, we cannot decipher what the jury's acquittal precisely determined: that

Smith was innocent of the robberies, that Smith did not carry a firearm, or that

Smith did not have the proper intent. And, even if the acquittal of the firearms

charge was based on a finding that Smith was innocent -- under federal law -- of

the armed robberies for which he was charged, this conclusion, as we have

discussed, may represent the jury's determination of a lack of nexus to interstate

commerce, rather than a finding that he in fact did not rob.[3]

B.     Eyewitness Identification Testimony Issues

---

[3]We also note that, even if we were to assume that the gun-count acquittal established that a *reasonable doubt* exists on whether Smith committed the robberies, the evidence was still admissible under <u>Dowling</u> because of the lower standard of proof: to admit the evidence in the trial under review now, the Government did not have to establish -- *beyond a reasonable doubt* -- that Smith committed the robberies. Instead, under Rule 404(b) of the Federal Rules of Evidence, similar act evidence is permissible if the jury can *reasonably conclude* that the act occurred. <u>See</u> <u>Dowling</u>, 110 S.Ct. at 672.

1.    Admissibility of Testimony on Certainty

Smith contends that the district court erred in permitting eyewitnesses

Davis, Shields and Roberts to comment on their level of certainty when testifying

about their identification of Smith.

We review the district court's decision to admit evidence for clear abuse of

discretion.  United States v. Smith, 122 F.3d 1355, 1357 (11th Cir. 1997).  No case

law in this Circuit or the Supreme Court has been brought to our attention that

prohibits the admission of testimony by an eyewitness about their level of

certainty in an identification.[4]  Nor was the testimony precluded under the Federal

Rules of Evidence.  We have never concluded that testimony about an

eyewitness's level of certainty has a tendency to confuse the jury so that it should

be precluded pursuant to Rule 403's prohibition of information creating "unfair

prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403.  In

fact, in assessing the reliability of an unnecessarily suggestive identification

procedure, we consider the level of a witness's certainty.  Cikora v. Dugger, 840

F.2d 893, 895 (11th Cir. 1988) (discussing Neil v. Biggers, 93 S.Ct. 375, 382

---

[4]Smith claims that the Supreme Court's decision in Simmons v. South Carolina, 114 S.Ct. 2187 (1994), stands for the proposition that a trial court's failure to correct any jury misperception results in a due process violation.  We, however, do not read Simmons this way.  Simmons stands for a more narrow proposition: briefly stated, that due process requires a jury to be informed -- in determining whether to impose a *death sentence or life imprisonment* -- that a defendant's life sentence renders him parole ineligible.

(1972)).  We note that the evaluation of an eyewitness's testimony is precisely the kind of analysis that is reserved for the jury.  See United States v. Billue, 994 F.2d 1562, 1565 (11th Cir. 1993) ("This court does not evaluate witnesses' credibility.  Such determinations are within the exclusive province of the jury.").  Therefore, the district court did not abuse its discretion in permitting the eyewitness testimony on this matter.

2.      Expert on Eyewitness Identification

Smith contends that the district court erred by excluding the testimony of Dr. Michael Leippe, an expert on the area of memory and perception, without conducting an appropriate inquiry.  Dr. Leippe would have commented on 1) the lack of correlation between certainty and accuracy; 2) the weapon-focus effect;[5] and 3) the impact of stress on memory.[6]

We review the district court's decision to exclude evidence for abuse of discretion.  Smith, 122 F.3d at 1357.  To determine whether expert testimony is

---

[5]The weapon-focus effect is a theory about the adverse affect on memory of the presence of a weapon.

[6]We reject Smith's claim that the district court erred by declining to hold a hearing or otherwise declining to consider whether the proffered testimony would assist the trier of fact.  The district court's (albeit brief) re-consideration of the eyewitness-identification expert testimony in this trial was not the first instance in which the court had reviewed this testimony.  And the district court specifically referenced its more thorough ruling from Smith's previous trial, where the court addressed the topics on which Dr. Leippe planned to testify and explained how the court reached the conclusion that such testimony would not assist the trier of fact.

admissible under Federal Rule of Evidence 702, we must determine two things: 1) whether the testimony is scientific knowledge, and 2) whether the testimony will assist the trier of fact.  Daubert v. Merrell Dow Pharmaceuticals, Inc., 113 S.Ct. 2786, 2795-96 (1993).

In United States v. Thevis, 665 F.2d 616, 641 (5th Cir. Unit B 1982) (superseded by statute on other grounds), we concluded that a district court did not err in excluding proffered expert testimony about eyewitness reliability because we concluded that such testimony does *not* assist the jury.[7]  We reaffirmed this conclusion, post-Daubert, in United States v. Smith, 122 F.3d 1335, 1357-59 (11th Cir. 1997), where the defendant sought to present the testimony of an expert about all three of the issues which Smith sought to present here.  Therefore, based on Smith, we conclude that the district court did not abuse its discretion in excluding the expert testimony about these topics.[8]

---

[7]In Stein v. Reynolds Sec., Inc., 667 F.2d 33, 34 (11th Cir. 1982), we concluded that Unit B panel or en banc court decisions of the former Fifth circuit are binding precedent in this Circuit.

[8]We reached this decision in Smith by referencing our reasoning in Thevis: 1) such testimony would permit a witness to comment on the credibility of another witness; 2) the problems of eyewitness identification could be addressed through cross-examination; and 3) a jury could weigh the problems of eyewitness identification through common-sense analysis.  See Smith, 122 F.3d at 1357-59.
Smith has presented data that might undermine parts of this rationale.  He specifically presents evidence tending to demonstrate that the lack of correlation between a witness's level of certainty and the accuracy of their identification is *not* within the common sense of the jury. But as in our decision in Smith, we feel limited by the prior-panel-precedent rule: only a decision of this Court en banc or the Supreme Court may overrule Thevis and Smith.  See Smith, 122 F.3d at 1359.

We suspect that even if the exclusion was an error, the error was harmless. In addition to the testimony of three eyewitnesses, the Government presented the testimony of several other people linking Smith to the robbery.[9]

3.    Instruction on Eyewitness Certainty

We review the district court's refusal to give a defendant's requested jury instructions for abuse of discretion. United States v. Chirinos, 112 F.3d 1089, 1101 (11th Cir. 1997). A refusal to give a requested jury instruction is an abuse of discretion if: "1) the instruction is correct; 2) the court did not address the substance of the instruction in its charge; and 3) the failure to give the instruction seriously impaired the defendant's ability to present an effective defense." United States v. Sirang, 70 F.3d 588, 593 (11th Cir. 1995). "[W]e examine whether the jury charges, considered as a whole, sufficiently instructed the jury so that the

---

By the way, even if the district court erred in excluding this element of Dr. Leippe's testimony, the error was probably harmless. The eyewitness identifications were not the linchpin of the prosecution's case. The prosecution gave only limited attention to the witness's level of certainty in presenting its case: only a single question in the Government's direct examination of each of the eyewitnesses asked whether they had any "doubt" that Smith was the robber.

[9]As one example, Todd Griffin corroborated the eyewitness accounts. As another, two women -- Linda Gardner (Smith's ex-girlfriend of several years) and her mother -- identified Smith when viewing the bank surveillance video/pictures. Therefore, even if the district court erred by excluding the testimony of an expert who would have undermined the eyewitnesses' identifications, the error was harmless because the Government presented substantial additional evidence of Smith's guilt.

Those courts that have admitted experts like Dr. Leippe have reached that conclusion in part because the eyewitness identification played a much more significant role in the prosecution's case. See, e.g. United States v. Lester, 254 F.Supp.2d 602, 610 (E.D. Va. 2003) (observing that the Fifth, Sixth and Eighth Circuits take this approach).

11

jurors understood the issues and were not misled." Bogle v. McClure, 332 F.3d 1347, 1357 (11th Cir. 2003).

Here, Defendant requested the judge to provide a pretty elaborate (four pages long) instruction on the accuracy of eyewitness identifications. The requested instruction included a discussion that emphasized a variety of factors that potentially affect eyewitness identifications, including: the circumstances surrounding the identification, the age and race of the eyewitness, stress, the viewing of mug shots or photo spreads or both after the criminal event but before a later in-person identification, the length of time between the criminal event and the later identification, the lack of correlation between witness confidence and accuracy, and the conditions affecting viewing during the time of the crime (including the presence of a weapon, visibility and distance). The requested instruction was argumentative at some points: for example, "When a weapon is present, the witness'[s] attention is drawn to the weapon and away from the facial and physical characteristics of a perpetrator" (emphasis added) reads like opposition to the eyewitness identifications rather than guidance to jurors about their role in evaluating the accuracy of testimony.

The district court did give an instruction guiding the evaluation of eyewitness identification which broadly addressed the substance of the requested

charge. Although the given instruction may not have detailed *every* factor that Defendant highlighted *might* affect an identification, the district court's instruction was sufficiently comprehensive to assist the jury in evaluating the accuracy of the eyewitness identifications. The court instructed the jury on the effect of circumstances surrounding the identification, the race of the eyewitness, stress, the length of time between the criminal event and the later identification, and conditions affecting eyewitness observation during the time of the crime (including visibility and distance). This instruction addressed the substance of the potential problems -- both physical and psychological -- that Defendant requested the trial court to explain might affect the accuracy of eyewitness identifications.

For example, although the district court's instruction did not specifically address the weapon-focus effect, this factor was encompassed by the instruction on the effect of stress: a jury can infer -- without instruction -- that the presence of a weapon may create a stressful environment, which (as they were properly instructed) may affect the accuracy of an identification. As another example, on the requested instruction about the effect of viewing mug shots or photo spreads (or both) after the criminal event but before a later in-person identification, we believe that the district court's instruction to the jury to consider the circumstances surrounding the later identification encompasses this caution: a witness's prior

13

viewing of a picture of the Defendant is a "circumstance" that may affect the later identification.

We conclude that the district court's refusal to give Defendant's instruction was no abuse of discretion: the jury was sufficiently instructed and not misled.[10]


C.    Photographic Lineup


We review for clear error the district court's decision that an identification procedure was not unduly suggestive.  Cikora v. Dugger, 840 F.2d 893, 895-96 (11th Cir. 1988).

Smith contends that the photographic lineup was unduly suggestive because 1) Smith was the only person presented in front of a cinder block background; 2) Smith wore a blue T-shirt -- in contrast to four of the other six people photographed -- and the robber was alleged to have worn a blue T-shirt; 3) the

---

[10]Smith improperly characterizes this Court's opinion in the earlier Smith case as a mandate, rather than a suggestion, that a trial court can instruct the jury about the considerations impacting on the reliability of eyewitness identification.  In denying a defendant's expert on eyewitness testimony, we suggested in Smith that possible problems with eyewitness testimony can be -- and in that case were (although from the appellate opinion, we do not know in what detail) -- highlighted through jury instructions.  United States v. Smith, 122 F.3d 1355, 1359 (11th Cir. 1997).  But, we have never mandated such instructions as part of the law of the Circuit, and it was not, on that account, an abuse of discretion for the district court in this case to deny the requested instruction.

officer told witness Davis that the suspect was in the lineup; and 4) the officer conducting the lineup was the lead detective on the case (and therefore potentially gave non-verbal cues).

A lineup is not unduly suggestive merely because the defendant's photograph can be distinguished from the others. See Cickora, 840 F.2d at 896-97 (district court did not clearly err by admitting identification resulting from lineup where only defendant's photo had height markings in the background and the defendant was a different race than several other persons photographed). In addition, we have concluded that a lineup was not suggestive where the witnesses were told that the suspect was in the lineup. Id. And, here, we note that -- other than alleging the *potential* for an officer who knows which photograph contains the suspect to provide non-verbal cues -- Smith has presented no evidence of specific gestures or signals that the officer gave that influenced the identification. Moreover, upon our reviewing the actual pictures used, we agree with the magistrate judge that the men in the lineup had "substantial similarity in facial features, complexion, facial hair, and general body type and appearance." Therefore, we conclude that the district court was correct in determining that the lineup was not unduly suggestive.

D.	Limitation of Cross-Examination

Smith contends that the district court erred by prohibiting him from cross-examining Dawn Shields and Linda Roberts on their alleged bias (Smith believes that because he was acquitted of committing the robberies in which they were victims -- despite their earlier testimony in those trials -- they had a motive to ensure he was convicted in the trial for the bank robbery).  Because Smith did not object to the limitation, we review the decision for plain error. United States v. Hawkins, 905 F.2d 1489, 1493 (11th Cir. 1990).

The district court's limitation was reasonable.  Other than his own theory, Smith provided no evidence that the clerks' testimony was biased.  See United States v. Gonzalez, 71 F.3d 819, 835-36 (11th Cir. 1996) (limitation of cross-examination appropriate where no evidence suggesting that witness was biased). And the court's prohibition of Smith's questioning about this issue was expressly subject to being lifted in the event of any indication of bias: Smith was permitted to cross the witnesses on their bias if their testimony either deviated significantly from the earlier trial or they became "vociferous."  In addition, the jury was informed of the underlying events that would have created the alleged bias: they knew that Smith was allegedly involved in the convenience store robberies and

16

was acquitted. Therefore, the district court did not plainly err in placing this "reasonable limit[]" on Smith's cross examination of Shields and Roberts. See Delaware v. Van Arsdall, 106 S.Ct. 1431, 1435 (1986).

E.    Downward Departure for Sentencing

We reject Smith's claim that the district court erred in failing to require the Government to file a downward departure for substantial assistance. The district court did not clearly err in finding that Smith was unable to provide substantial assistance in the sentencing of his former cellmate after Smith had called into question the veracity of "jailhouse snitches" himself.[11]  See United States v. Carlson, 87 F.3d 440, 447 (11th Cir. 1996) ("[w]e review for clear error the district court's factual findings regarding the defendant's substantial assistance.")

Conclusion

For the foregoing reasons, we AFFIRM Smith's convictions and sentence.

---

[11]We need not decide whether the Government's refusal to file a downward departure motion in retribution of a defendant's exercise of his Sixth Amendment rights is an "unconstitutional motive," because we conclude that the district court did not clearly err in finding that that was not Government's motivation here.